## Industrial Board v. Hilti Rapid Fastening Systems, Inc.

12

*Anne X. Alpern*, Attorney General, for Commonwealth.

*Hull, Leiby & Metzger*, for appellant.

HERMAN, J., May 28, 1962.—We have before us in this matter an appeal by Hilti Rapid Fastening Systems, Inc., sometimes called Hilti, Inc., (but hereinafter referred to as "Hilti"), from an order of the Industrial Board, in the Department of Labor and Industry, of the Commonwealth of Pennsylvania, directing Hilti to discontinue sales of the "Hilti DX 100-L" powder actuated tool until certain modifications in its design are made and approved, and further directing that the use of this tool be discontinued in this Commonwealth.

Pursuant to provisions of the Act of June 2, 1913, P. L. 396, sec. 14, 71 PS §1443, and to the provisions of the Act of May 18, 1937, P. L. 654 sec. 12, 43 PS §25-12, sometimes called the General Safety Law, regulations governing operation of powder actuated tools were adopted and were promulgated and made effective as of May 22, 1958, by the Secretary of Labor and Industry.

The General Safety Law provides, in part, in section 2(g) (43 PS §25-2(g)):

"All building construction . . . shall be conducted in a manner as to avoid accident hazards to workers or the public . . . [E]quipment used in such opera-

tions, shall be designed, manufactured, constructed, and erected as to be safe for the purpose intended. . ."

The regulations referred to above which initially have a bearing on the case at hand are these:

"SECTION 4. GENERAL REQUIREMENTS

"Rule 1. Approval of Equipment

"(a) No powder actuated tool shall be operated or used within this Commonwealth unless:

"1. the tool, including protective shield and all accessories pertaining thereto, shall be of an approved type; . . .      *      *      *      *

Rule 3. Safety Precautions

"(a) Protective Shield. Powder actuated tools shall not be used without an approved protective shield or muzzle attachment appropriate for the particular tool and designed to confine flying particles and minimize the possibility of ricocheting of studs, pins, or fragmentation, property attached thereto. Only those tools shall be used which cannot be fired without the protective shield, muzzle attachment or guard in proper place.

"(b) Special Protective Shield. Where a standard shield or guard cannot be used, or where it does not cover all apparent avenues through which flying particles might escape, a special approved shield or guard fixture of the jig, designed and built by the manufacturer of the tool being used to provide this degree of protection, shall be used as a substitute.
      *      *      *      *

"(d) Tool Position. The tool shall be perpendicular to the material being penetrated at the time of firing, except when protected in accordance with Rule 3—Paragraphs (a) and (b).
      *      *      *      *

"SECTION 5. SPECIAL REQUIREMENTS FOR MANUFACTURERS
      *      *      *      *

"Rule 7. Safety Locks

"(a) Powder Actuated Tools shall be provided with safety locks so designed that failure of any part of the tool or lock will cause the tool to be in an inoperative position. The lock shall also be designed so that it can only be manually set and cannot get into firing position through fall or other accidental occurrence.

\* \* \* \*

"Rule 9. Firing Position

"(a) The firing mechanism shall be so designed that the tool cannot fire during loading or preparation to fire, or if the tool is dropped while loaded. Firing of the tool shall be dependent upon at least two separate and distinct operations of the operator, with the final firing movement being separate from the operation of bringing the tool into the firing position. These requirements provided for in this rule are in addition to those required by Rule 7.

"(b) The tool shall be so designed as not to be operable other than against a work surface and unless the operator is holding the tool against the work surface with a force of at least five (5) pounds greater than the total weight of the tool.

"(c) The tool shall be so designed that it will not operate when equipped with the standard guard indexed to the center position, if the bearing surface of the guard is tilted more than 8° from contact with the work surface."

Hilti designed, manufactured and put into use the "Hilti DX 100-L," a powder actuated or powder assisted tool quite different, both in design and in operation, from the conventional powder actuated tools, and sought approval for its sale and use in Pennsylvania. After an informal rejection of its request, Hilti filed a petition with the Industrial Board seeking approval of its tool in spite of the fact that it admittedly failed to conform to the rules quoted above on the grounds

that the regulations, as applied to this tool, are unreasonable and should not apply, and that this tool should be exempt from compliance, or, in the alternative, requesting the board to amend its regulations to establish a separately defined category of tools into which this tool would fall, with only such regulations applicable thereto as would be reasonably required in the interest of safety, or requesting the board to promulgate a separate set of regulations for this type of tool which regulations would be reasonably necessary in the interest of safety.

Hilti points to section 4, rule 1 (c) of the rules which provides: "(c) Tools of a special design not anticipated by the regulations must be of an approved type"; and avers that the tool in question should be approved by the board under this provision.

A hearing was had before the Industrial Board and the board's adjudication followed. Thereafter, Hilti appealed to this court.

The conventional type powder actuated tool, the type contemplated when the regulations were adopted, is a gun-type tool which looks much like a large pistol with a pistol-grip, trigger and barrel. An explosive charge similar to pistol ammunition propels through the barrel in free flight a fastener which partially penetrates the work surface (generally a wall or ceiling in building construction) against which the tool is pressed, leaving a part of the fastener protrudent to which other structural material may then be fastened. The reason for the explosive charge is that the work surface into which the fastener must go is generally too hard for the fastener to penetrate by mere blows of a hammer. The principle of this type tool, sometimes called a "stud-gun," is that with low mass, i.e., the small lightweight fastener, the said fastener is propelled by high velocity through the barrel just as a projectile goes through a gun barrel.

Experience with this type tool has shown that in the use thereof there is danger to the operator and others nearby from ricochet, "fishhooking," [1] explosive spall, and drop-firing, and to persons other than the operator from overpenetration and air-firing. The regulations were designed to eliminate or reduce these hazards and as far as the conventional tool is concerned they have a reasonable relationship to the hazard and result in a much safer operation.

There seems to be no doubt that the Hilti tool in many ways fails to meet the requirements of the regulations, and if this were all there were to the case we should dismiss the appeal forthwith. But, there are much broader principles involved.

Can these regulations legally apply to the "Hilti DX 100-L", which is of an entirely new design and which, if we believe the testimony of the manufacturer and his witnesses, does not subject the operator nor others nearby to the hazards present with the conventional tools? If the regulations do not apply here, then should this tool be considered or approved under the regulation, section 4, rule 1(c) which, as we have seen, provides that: "Tools of a special design not anticipated by the regulations must be of an approved type"?

The "Hilti DX 100-L" operates on the principle of propelling by powder a heavy mass with low velocity *after* the fastener has been started into the work surface by a blow of a hammer. It has sometimes been

---

[1] "Fishhooking" is the term applied to the condition which results when a fastener hits an unusually hard object beneath the surface and is thus turned and enters free flight in the general area of the operator and other workmen. The fastener, being propelled like a bullet, has great velocity and upon striking a human being can cause serious injury and even death, as in ricocheting which results when the fastener does not enter the work surface at all but goes into free flight.

said that the Hilti tool is not a powder *actuated* tool at all, but merely a powder *assisted* tool and it is true that for fastening fasteners to soft material the blow of the hammer is sufficient without the powder assist, and the tool is frequently so used.

The tool may be described as cylindrically shaped, into one end of which a fastener is inserted with the point practically flush with the work surface into which it is to be propelled. The cartridge, if one is to be used, is inserted into the tool in such a manner that when the tool is struck by the hammer on the end opposite to the one from which the fastener will emerge, a piston will push the fastener partially into the work surface and at that instant, because of the resistance of the work surface to the fastener, the cartridge is exploded, propelling the piston which in turn pushes the fastener farther into the work surface.

It is averred that because the principle here is the propelling of a *heavy* mass, i.e., the piston and the fastener at *low* velocity, since the fastener starts at the work surface rather than back from it as in a gun barrel, no ricocheting or "fishhooking" or explosive spall can result and, consequently, if it is required that a shield be attached, such requirement would contribute nothing to the safety of the tool. It is further averred that, while it is conceivable that the tool may be drop-fired, such an occurrence has never been known to have happened in actual use, and that when a contrived test was given, it was found that the tool would only fire when dropped from a height of at least four feet, exactly perpendicular to the floor, and that even then, because of the tool's construction, the fastener left the tool with so little velocity that it could do no harm. It was also further averred that it was difficult and awkward to air-fire it, and here, too, because of the unique construction, the fastener left the tool with very little velocity and could cause little or no harm.

In support of these averments, Mr. L. A. Root, Vice President of the Hilti Company, testified at length that the tool in question was safer than the conventional tools; that because of its novel design drop-firing could cause little if any damage or injury, if indeed it could be drop-fired; that, also because of its design, explosive spall, "fishhooking," ricocheting, or over-penetration were virtually eliminated as dangers from its use.

A great number of users of the Hilti tool located in Central and Eastern Pennsylvania, including Pennsylvania Power & Light Company, Hershey Estates and the Hershey Chocolate Corporation, and Armstrong Cork Company, in answer to a questionnaire sent to them by the company, indicated not only that they thought that the tool in question was safer than conventional tools, but that in use there had never been, and the companies believed there could not be, any overpenetration, ricocheting, nor any injury from spall.

While this type of evidence would be objectionable as hearsay in a court of law, it was admitted without objection in the hearing before the board and we believe rightly so because the Administrative Agency Law requires that agencies shall not be bound by technical rules of evidence, and that any relevant evidence of reasonable probative value may be received: Act of June 4, 1945, P. L. 1388 sec. 32, 71 PS §1710.32.

At an adjourned hearing before the Industrial Board on December 14, 1960, Elmer C. Best, Chairman of the Safety Committee of a carpenters' union, District Council of Pittsburgh and vicinity, testified that he had used the conventional powder actuated tools and also the Hilti tool and, although admittedly his use of the Hilti tool was not too extensive, he also witnessed two very thorough demonstrations of it. He further testified that, in his opinion, the absence of a spall

guard did not detract from the safety of the Hilti tool because, due to the low velocity, there was no spall and neither was there any danger from ricocheting or "fishhooking". As to drop-firing, he testified that the danger here was "so negligable [sic] that you could almost eliminate it. It is within the sphere of possibility but very highly improbable." He further said when asked whether he had observed any accidents that might have occurred with the use of the Hilti tool, "I have not. I can't conceive how an accident can happen." And, further, "I think that beyond all shadows of doubt it [the Hilti tool] is safest of any I have saw or used."

James R. Fenn also testified at the adjourned hearing of the Industrial Board. He is a working carpenter and a member of Local 333, New Kensington, Pennsylvania. Mr. Fenn has used powder actuated tools quite extensively, holding licenses to operate the Omar, the Ramset, and the Hilti. He testified that he had used the Hilti extensively recently and thinks "it is the best, as far as [he] is concerned, safety-wise." He pointed out that when fired where there is no resistance the fastener "seems to die," and that he never experienced any spall with this tool.

Then too, it was shown by testimony of Mr. Root, supported by an exhibit, that the Corps of Engineers of the United States Army, the States of New Jersey, New York, and Ohio (Maryland had no regulations at the time of the hearing), and many municipalities and labor unions have approved the use of the Hilti tool.

As against this evidence, two experts, both graduate engineers and both with years of experience with powder actuated tools but each employed by a company competing with Hilti, testified that in their opinion the "Hilti DX 100-L" was dangerous. Mr. R. J. Turtin, a research engineer for Remington Arms Company, who for six years has been engaged in test-

ing powder actuated tools of his own and competing companies, testified that he had tested the tool in question and found that the fastener from it would go completely through ½ inch to ¾ inch pine and wallboard and would then go into free flight; that when fired into the air and not against a work surface the velocity of the fastener was between 104 and 215 feet per second,[2] depending upon the size of the propelling cartridge. He testified further that, in his opinion, ricochet could easily occur with this tool and, in his opinion, it wasn't safe.

Mr. C. J. DeCaro, director of research for Ramset, a division of Olin-Mathieson Company, who had ten years experience with powder actuated tools, testified that ricochet could occur with this tool; that it could be drop-fired at which time the fastener would travel 229 feet per second; that it could be fired in the air and that the tool was not safe.

Although the record in this case before the Industrial Board leaves much to be desired, it appears therefrom that in the Department of Labor and Industry there is also a Powder-Actuated Tool Advisory Board whose unofficial duty it is to advise the Industrial Board in matters pertaining to this type of tool. From the exhibits it further appears that this advisory board, prior to the hearing before the Industrial Board, denied the prayer of Hilti. It seems significant that while three of the members of this board testified in the hearing, they testified only to what was already admitted: that the DX 100-L did not conform to the regulations. While some of the members of this advisory board are impartial experts in this field, not one testified that the Hilti tool was dangerous in any way.

It seems to us that the basic question to be deter-

---

[2] It should be pointed out that in similar tests the conventional tool propelled fasteners 650 to 1,300 feet per second.

mined is whether or not this tool is so unsafe in its operation that, regardless of the fact that it is of a different design from the conventional tool and as such cannot readily be adapted physically to conform to all the rules, it must be disapproved for use in Pennsylvania as it is now constructed, or, is it of such a drastically different design and its relative safety such that it should be approved under section 4, rule 1(c), as before quoted?

The Administrative Agency Law under which the present appeal was taken (Act of June 4, 1945, P. L. 1388 (71 PS §1710.1, et seq.) provides, in section 44, that we "shall affirm the adjudication unless [we] shall find that the same is in violation of the constitutional rights of the appellant, or is not in accordance with law . . . or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. . ."

The board made nine findings of fact. Findings of fact nos. 1 to 8, inclusive, are either admitted or supported by substantial evidence, or are not necessary to support the adjudication.

The ninth finding of fact is: "There is danger, in the operation of this tool, of injury from explosive spall and if drop fired." There was no finding of any other danger from the use of the tool.

We have carefully searched the entire record and can find *no* substantial evidence to support the finding that there is danger of injury from explosive spall in the operation of this tool, and this leaves for our consideration only the finding of danger from drop-firing.

Mr. L. A. Root, Vice President of Hilti, readily admitted that this tool could be fired accidentally (drop-fired) or in air, but averred that because of the low velocity and other features of the tool, the fastener propelled by an accidental firing would do little more

than scratch a person struck by it. And, while the laboratory reports of H. P. White Laboratory, an independent research and development engineering concern whose integrity was conceded by all parties, showed that when dropped from a height of at least four feet, head down, the tool would fire, there was no evidence that then the fastener would enter free flight at 229 feet per second, or at any other speed. Mr. De-Caro, however, in testifying concerning the H. P. White report, said that in his opinion the tool was not safe and he "would not enjoy being with this thing."

"Substantial evidence" referred to in the statute is well defined in Pennsylvania State Board of Medical Education and Licensure v. Schireson, 360 Pa. 129, 133 (1948), which quotes from the opinion by Mr. Justice Horace Stern (later Chief Justice) in P. L. R. B. v. Kaufmann Dept. Stores, Inc., 345 Pa. 398 (1942):

" 'All orders and decrees of legal tribunals, including those of administrative boards and commissions, must be supported by evidence sufficient to convince a reasonable mind to a fair degree of certainty; otherwise our vaunted system of justice would rest upon nothing higher than arbitrary edicts of its administrators. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion": Consolidated Edison Co. v. National Labor Relations Board, 305 U. S. 197, 229. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established": National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U. S. 292, 300. "The rule of substantial evidence is one of fundamental importance and is the dividing line between law and arbitrary power": National Labor Relations Board v. Thompson Products, Inc., 97 Fed. 2d 13, 15;

National Labor Relations Board v. Union Pacific Stages, Inc., 99 Fed. 2d 153, 177.' "

We believe that there is no more than a mere scintilla of evidence in this case to show danger from the drop-firing of this tool and we must reverse the board.

Having found that there is no danger from explosive spall from the use of this tool and, further, that there is insufficient evidence to conclude that there is danger from drop-firing, and there being no finding of any other danger, we turn now to the admitted violations of the regulations.

The basic laws involved here are the Act of June 7, 1923, P. L. 498 sec. 203, as amended, 71 PS §13, which establishes the Industrial Board in the Department of Labor and Industry; the Act of April 9, 1929, P. L. 177 sec. 2214(b), 71 PS §574(b), which authorizes the Industrial Board to hold hearings; the Act of June 2, 1913, P. L. 396 secs. 13, 14, and 15, 71 PS §§1442, 1443, and 1444, which gives the Industrial Board the power to make investigations and report upon all matters concerning all laws of the Commonwealth the enforcement of which is imposed on the Department of Labor and Industry, and to make general rules and regulations necessary for applying the laws to specific conditions and to prescribe means, methods, and practices to carry into effect such laws, such rules and regulations to embrace all matters and subjects to which the power and authority of the Department of Labor and Industry extends, section 1444 also providing that "Any . . . person interested, either because of ownership in or occupation of any property affected by any such order or regulation, or otherwise, may petition for a hearing on the reasonableness of a rule or regulation" and such hearings shall be then held; and the Act of May 18, 1937, P. L. 654 sec. 2(g), 43 PS §25-2 and sec. 12, 43 PS §25-12, which provides:

"(g) All building construction . . . shall be conducted in a manner as to avoid accident hazards to workers or the public. . . . [*E*]*quipment used in such operations, shall be designed, manufactured, constructed, and erected as to be safe for the purpose intended.* . .[3]

"25-12.

"The Department of Labor and Industry shall have the power and its duty shall be to make, alter, amend, and repeal rules and regulations for carrying into effect all the provisions of this act, and applying such provisions to specific conditions."

These laws and the rules promulgated under them are exercises of the police power of the State and, if a proper exercise, are constitutional. It has been said that:

"Probably the most important function of government is the exercise of the police power for the purpose of preserving the public health, *safety* and morals, and it is true that, to accomplish that purpose, the legislature may limit the enjoyment of personal liberty and property. It is also true. . . that the police power has been juridically extended to many fields of social and economic welfare. But . . . the power is not unrestricted; its exercise, like that of all other governmental powers, is subject to constitutional limitations and judicial review. By a host of authorities, Federal and State alike, it has been held that a law which purports to be an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained. Under the guise of protecting the public interests the legislature *may not* arbitrarily interfere with private business or *impose*

---

[3] Italics throughout ours unless otherwise indicated.

*unusual and unnecessary restrictions upon lawful occupations. . . .*": Gambone v. Commonwealth, 375 Pa. 547, 550-51 (1954).

In Hertz Driveurself Stations, Inc. v. Siggins, 359 Pa. 25, 47-48 (1948), it was said:

". . . In any circumstances, an exercise of such power, if it is to be valid constitutionally, must bear a reasonable relation to a lawful end sought to be attained thereby. In short, the police power can never be exerted legally except it be exercised in the public interest. Consequently, unless a given exercise of the power promotes or tends to promote the public safety, health, morals or welfare, it is without constitutional sanction. For a legitimate exertion of the police power there must be 'a reasonable and substantial relation between the thing acted on and the end to be attained, one that promotes health, safety or general welfare, necessary to the common good, and a reasonable demand for regulation, not one that is merely an unnecessary "experimentation (or interference) with the fundamental rights of the individual . . .''''"

And at 50-51:

". . . The stifling of competition through an exercise of the State's police power is never justifiable except that it be done, and actually be, in the public interest. As the highest attribute of government (*Salus populi est suprema lex*), the police power must, at all times, be exercised with scrupulous regard for constitutionally guaranteed private rights. It can be properly exercised only in the public welfare; and, if exercised otherwise, the exertion will be stricken down as a perversion of the sovereign power. . . ." (Italics theirs.)

To deprive the workmen of Pennsylvania of the right to use this tool when similar workmen in all of our neighboring States use it extensively as well as do the workmen in every State where permission to use has been sought, would be a grave injustice. To hold

that the violated regulations as drawn apply to this tool would be an unwarranted extension of the police power, for we believe that the tool is "designed, [and] manufactured . . . as to be safe for the purpose intended": Act of May 18, 1937, P. L. 654, supra, Consequently, we conclude that this tool should be approved under section 4, rule 1(c), supra, subject only to the rules and regulations pertaining to instructions to operators, and proper practices in its use.

We, therefore, make the following:

### Order

And now, May 28, 1962, the appeal of Hilti Rapid Fastening Systems, Inc., is sustained and the order of the Industrial Board, dated December 20, 1960, is reversed and the "Hilti DX 100-L" as constructed is hereby approved for use in Pennsylvania.