454 A.2d 1

COMMONWEALTH of Pennsylvania, DEPARTMENT OF
ENVIRONMENTAL RESOURCES, Appellant,

v.

BUTLER COUNTY MUSHROOM FARM and Roy
Lucas, Appellees.

Supreme Court of Pennsylvania.

Argued Sept. 20, 1982.

Decided Dec. 23, 1982.

Dennis W. Strain, Pittsburgh, for appellant.

Harley N. Trice, II, Reed, Smith, Shaw & McClay, Pittsburgh, for appellees.

Before O'BRIEN, C.J., and ROBERTS, NIX, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

## OPINION

NIX, Justice.

This appeal is being entertained to consider the holding of the Commonwealth Court that the Pennsylvania General Safety Law, Act of May 18, 1937, P.L. 654, as amended, 43 P.S. § 25–1 *et seq.* (Act) does not authorize the issuance of administrative compliance orders. We disagree for the reasons that follow and reverse the order issued below. 61 Pa.Cmwlth. 48, 432 A.2d 1135.

On October 10, 1980 the Department of Environmental Resources (DER) issued an order directed to the Butler County Mushroom Farm, Inc. (Butler) and to Roy Lucas (Lucas), Butler's maintenance supervisor at the mines, requiring a check system identifying all persons entering and exiting the underground areas of Butler's operation. A brief summation of the factual setting will assist in framing the legal issue presented.

Butler is engaged in the business of growing mushrooms in worked-out, underground limestone mines in West Winfield, Butler County and Worthington, Armstrong County. The areas were developed for mushroom growing by the construction of a floor and supports for the ceiling and sides of individual rooms or caverns, sized approximately 20 feet

wide, 120 feet long and 15 feet high. Water and electric lines and drains have been installed. The operation employs about 950 people, half of whom work underground. The mushrooms are grown in flat wooden trays that are seeded and stacked to the ceiling in the rooms and periodically watered and inspected. After a relatively short maturing period, the trays are removed by gasoline powered tractors to different areas for picking. After the trays are replenished, they are returned to the growing rooms and again stacked by gasoline powered high-lifts.

The potential for fire hazard arises from the presence of gasoline and electricity at all underground facilities. Where fire occurs underground, the danger is enhanced because the smoke and carbon monoxide is emitted in a confined area. Any person, including experienced rescuers, who enters underground during a fire is in serious jeopardy from fumes, as well as the hazards of fire generated roof-falls. Where a fire occurs when no one is underground, the rescuers do not enter and the fire is allowed to burn itself out. Rescuers have become subject to the hazards of smoke, carbon monoxide, bad roof and exhaustion.

Butler had established a check system that accounted for the presence of their hourly employees. However, persons other than those who used the time clock to compute the earnings frequently entered the mine areas. The latter group included supervisory personnel, independent contractors, food service employees, telephone repairmen and visiting members of the public, including touring high school students.

Upon inspection a representative of the DER recognized the inadequacy of the then existing check system and, as a consequence, the DER ordered Butler and Lucas to implement a check system which would identify every person underground at any given time. This order was issued for the safety of those who may be underground at the time of a fire as well as those rescuers who could avoid an unnecessary hazardous entrance during a fire. The availability of accurate information as to the whereabouts of all at the

time of a fire was deemed essential to the protection of all concerned.

Butler and Lucas filed an appeal to the Environmental Hearing Board (Board) from the order challenging the DER's authority to issue it. The Board sustained the authority of the DER to issue the order in question and the Commonwealth Court disagreed. It is to be noted that Butler, although reserving the right to question the validity of the order, did set up a check-off system that complied with the directive. Compliance with the order merely required a recordation of everyone authorized to be in the mines at all times to be accessible to persons on the surface. It has not been suggested that this obligation was either impossible or unduly burdensome. The issue presented is confined to the authority for the issuance of such an order.

The result of the Commonwealth Court's holding is to restrict the DER to seeking judicial enforcement under the Act and to deprive it of the adjudicatory power[1] which is a customary and vital tool in the functional operations of present day administrative agencies. *See,* 1 Am.Jur.2d, Administrative Law § 16. While such a result is contrary to the normal practice of our General Assembly in creating administrative agencies of this nature,[2] Pennsylvania Hu-

---

[1] An "order" relates to the adjudication part of the administrative process. K. Davis, Administrative Law Treatise, 2nd ed., Vol. 2, § 7.2 (1979).

[2] The importance to an administrative agency of the power to issue compliance orders was best described in *Security and Exchange Commission v. Chenery Corp., et al.,* 332 U.S. 194, 202–203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1946).

Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity.

In other words, problems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular

man Relations Act, Act of October 27, 1955, P.L. 744, § 1, *as amended*, 43 P.S. § 951 *et seq.*, this uniqueness must, nonetheless, be accepted if it in fact represents the true legislative intention. Statutory Construction Act, Act of December 6, 1972, P.L. 1339, No. 290, 1 Pa.C.S.A. § 1921(a). We may not, in an effort to justify our interpretation of the spirit of the legislation, ignore the clear language of the Act. Statutory Construction Act, 1 Pa.C.S.A. § 1921(b); *In re Lawrence Township School District*, 362 Pa. 377, 67 A.2d 372 (1949). In contrast, we are mindful of the object of interpretation and construction of all statutes to ascertain and declare the true intention of the legislature and the prescription to give effect to all of the provisions of a piece of legislation is crucial in the avoidance of distortion of the legislative intent. Statutory Construction Act, 1 Pa.C.S.A. § 1921(a); *Hospital Association of Pennsylvania v. MacLeod*, 487 Pa. 516, 410 A.2d 731 (1980); *Commonwealth v. Hill*, 481 Pa. 37, 391 A.2d 1303 (1978).

■ We begin with the well settled principle that the power and authority to be exercised by administrative agencies must be conferred by the legislature. *Pennsylvania Human Relations Commission v. Transit Casualty Insurance Co.*, 478 Pa. 430, 387 A.2d 58 (1978); *Pennsylvania Human Relations Commission v. St. Joe Minerals Corporation*, 476 Pa. 302, 382 A.2d 731 (1978). The powers and authority must be either expressly conferred or given by necessary implication. *Pennsylvania Human Relations Commission v. St. Joe Minerals Corp., supra; Commonwealth v. Moeschlin*, 314 Pa. 34, 170 A. 119 (1934); *Day v. Public Service Commission*, 312 Pa. 381, 167 A. 565 (1933).

problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency.

The title to the Act unequivocally demonstrates a legislative concern for the safety of employees in their employment environment and also reflects an intent to confer upon the Department of Labor and Industry[3] the power to monitor such operations with a view to the safety of these employees.[4]

An Act to provide for the safety and to protect the health and morals of persons while employed; prescribing certain regulations and restrictions concerning places where persons are employed, and the equipment, apparatus, materials, devices and machinery used therein; prescribing certain powers and duties of the ... [Department of Environmental Resources] relative to the enforcement of this act; and fixing penalties.

Following a definitional section, the legislature proceeded to enumerate general safety and health requirements beginning with the broad provision:

Section 2(a)

All establishments shall be so constructed, equipped, arranged, operated, and conducted as to provide reasonable and adequate protection for the life, limb, health, safety, and morals of all persons employed therein.

In one of the more specific pronouncements of section 2, subsection (f) provides:

All pits, quarries, mines other than coal mines, trenches, excavations, and similar operations shall be properly shored, braced, and otherwise guarded, operated, and con-

---

**3.** The functions, powers and duties of the Department of Labor and Industry insofar as they relate to the regulation of pits, quarries, deep mines other than coal mines, trenches, excavations and similar operations as set forth in section 2(f) of the Act of May 18, 1937 prescribing certain powers and duties of the Department of Labor and Industry relative to the enforcement of this Act and fixing penalties were transferred to the Department of Environmental Resources in 1975. Reorganization Plan No. 2 of 1975, 71 P.S. § 756–2 (Supp.1981–82).

**4.** The title of an enactment is properly considered in the construction thereof. 1 Pa.C.S.A. § 1924; *Fedor v. Borough of Dormont,* 487 Pa. 249 n. 3; 409 A.2d 334 n. 3 (1979); *In re B.E.,* 474 Pa. 139, 144 n. 6, 377 A.2d 153, 155 n. 6 (1977).

ducted as to provide reasonable and adequate protection to workers employed therein.

After conferring in section 12 the power and duty to promulgate "rules and regulations for carrying into effect all the provisions" of the Act, the legislature set forth the following enforcement provision which is the subject of our instant inquiry.

Section 13.  The provisions of this act shall be enforced by the ... [Department of Environmental Resources].  For the purpose of enforcing the provisions of this act, the ... [Department of Environmental Resources] ... shall have the power to enter any room, building, or place where labor is employed, and to issue the necessary instructions to the superintendent, manager, or responsible agent of the employer, to correct violations of this act or regulations based on this act.

■  The Commonwealth Court concluded that this section merely permitted the DER personnel to enter "work places and issue instructions for the correction of violations."  61 Pa.Cmwlth. at 52, 432 A.2d 1135.  It rejected the position that this section granted DER power to issue administrative orders requiring compliance with the Act stating that such a conclusion was "lacking in lexicological and ratiocinative force."  61 Pa.Cmwlth. at 53, 432 A.2d 1135.  Such a position places undue stress upon the legislative use of the word "instructions" and ignores the stated purpose of the section to provide a means "of enforcing the provisions of the act." By so doing, the Commonwealth Court relegated that which the legislature expressly intended to serve as an enforcement device to the status of an instructional tool with no binding effect.

Appellees argue that there is no need to indulge in statutory construction "since the clear language of the act does not permit the issuance of administrative compliance orders. Viewed in the abstract, the word "instructions" is capable of

two or more meanings.[5]   While it is true that statutory language conferring power to administrative agencies must be clear and unmistakable, *Green v. Milk Control Commission,* 340 Pa. 1, 16 A.2d 9 (1940) it is also true that language capable of more than one meaning can be "clear and unmistakable" in the context of its usage by the selection of the meaning which is neither forced, strained nor contrary to the purpose for which the authority is conferred.[6]   In determining the intended meaning of the word "instructions" we employ the rules of construction of this Commonwealth and accord it "a common and approved usage" as required under 1 Pa.C.S. § 1903(a).

Statutory construction is not an exercise to be undertaken without considerations of practicality, precept and experience.[7]   We reemphasize, the object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly.   Statutory Construction

**5.**  "Instructions" primarily means something that instructs or is imparted in order to instruct as a lesson or precept; it is also "something given by way of direction or order—*usually used in the plural* (gave the maid instructions to wait for the grocer)." Webster's Third New International Dictionary (1976) p. 1173. (Emphasis added).

**6.**  "The grant of power and authority to be exercised ... must be by language which confers the authority and power involved without being interpreted in a forced and strained sense." (Footnotes omitted). 1 P.L.E., Administrative Law § 21.
  "One litmus of the breadth of an administrator's authority is the purpose for which the authority was conferred." *Upper St. Clair Tp. v. Com. of Pa. Dept. of Community Affairs,* 478 Pa. 546, 561, 387 A.2d 456, 464, (1978).
*See also, Com., Human Relations Commission v. Transit Cas. Ins. Co.,* 478 Pa. 430, 437, 387 A.2d 58, 62, (1978).

**7.**  "Nor can the canons of construction save us from the anguish of judgment.  Such canons give an air of abstract intellectual compulsion to what is in fact a delicate judgment, concluding a complicated process of balancing subtle and elusive elements.  All of our three Justices [Mr. Justices Holmes, Brandeis and Cardoza] have at one time or another leaned on the crutch of a canon.  But they have done so only rarely, and with a recognition that these rules of construction are not in any true sense rules of law.  So far as valid, they are what Mr. Justice Holmes called the axioms of experience n. 43. *Boston Sand & Gravel Co. v. United States,* 278 U.S. 41, 48 [49 S.Ct. 52, 73 L.Ed. 170] (1928)." Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Col.L.Rev. 527, 544 (1947).

Act of 1972, 1 Pa.C.S. § 1921(a). Here the legislative intention in its use of the word "instructions" becomes clear when we consider, *inter alia,* the purpose of the statute, the circumstances under which it was enacted, the object to be attained, former law or precedent and the consequences of a particular interpretation. Following such precepts, it is manifest the legislature intended the broader meaning of direction or order for the word "instructions." Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(c).

Appellees artfully characterize the language "instructions" used in Section 13 as having only the meaning of an informational tool. Appellees then assert that their selected meaning is binding in determining the power of the agency; thus, creating an internal contradiction in the statute.

Appellees' position ignores the facts that (1) a forced and narrow meaning of the word "instructions" creates a mischief to be avoided (an obviation of the stated purpose of the section); (2) it is inappropriate to determine the power of an administrative agency in a linguistic vacuum; and (3) the power of administrative agencies includes such powers as are implied necessarily.

Ignoring practical considerations, the Commonwealth Court attempted to buttress its forced and strained construction by arguing that the word "order" is commonly used in legislation conferring powers in administrative agencies and was not used in Section 13. Use of the word "order" in such acts as the Clean Streams Law, Act of June 22, 1937, P.L.1987, 35 P.S. § 691.1 *et seq.,* Solid Waste Management Act, Act of July 7, 1980, P.L. 380, § 101, 35 P.S. § 6018.101 *et seq.,* and the Air Pollution Control Act of January 8, 1960, *as amended,* P.L. 2119, 35 P.S. § 4001 et seq., does not establish a precedent of *exclusive* use of the word "order" by the legislature when conferring the power to issue a directive. For example, the word "order" is not used in Section 957(e) of the Pennsylvania Human Relations Act, Act of October 27, 1955, P.L. 744, § 7, *as amended,* 43 P.S. § 957(e).[8] Yet it has been recognized that the Human

8. The Commission is authorized to:

\* \* \* \* \* \*

(e) To formulate policies to effectuate the purposes of this act, and make recommendations to agencies and officers of the Com-

Relations Commission was conferred with administrative power to issue directives.[9] *Pennsylvania Human Relations Commission v. Norristown School District,* 473 Pa. 334, 345, 374 A.2d 671, 677 (1977).

Appellees imply that administrative enforcement is not available to the agency by focusing upon the fact that the Safety Act itself does not explicitly set forth the enforcement scheme. However, administrative enforcement of the Act envisioned by the Administrative Agency Law,[10] is evidenced by the former role of the Industrial Board when the Act was administered by the Department of Labor and Industry. The laws which established the administrative enforcement scheme are, *inter alia,* the Act of June 7, 1923, P.L. 498, sec. 203, *as amended,* 71 P.S. § 574(b), which authorized the Industrial Board to hold hearings; and the Act of June 2, 1913, P.L. 396, Section 13, 71 P.S. § 1442, which empowered the Industrial Board to make investigations and report upon all matters concerning all laws of the Commonwealth, the enforcement of which was imposed on the Department of Labor and Industry including the life,

monwealth or political subdivisions of government or board, department, commission or school district thereof to effectuate such policies.
43 P.S. § 957(e) (1964).

**9.** As was succinctly stated by Mr. Justice Roberts in *Pennsylvania Human Relations Commission v. Norristown School District,* 473 Pa. 334, 345, 374 A.2d 671, 677 (1977):

The Administrative Agency Law envisions that administrative agencies may proceed by rule-making or adjudication. Compare 71 P.S. § 1710.21 (1962) with 71 P.S. § 1710.31 (1962). Under the PHRA, the Commission is authorized to promulgate rules and regulations, formulate policies and make recommendations to school districts to effectuate these policies, and file complaints and conduct public hearings if efforts at conciliation fail. Nothing in the Administrative Agency Law or PHRA prevents the Commission from preceeding by way of adjudication rather than by rule-making. [Footnotes omitted.]

**10.** *See* 2 Pa.C.S.A. § 504 (1978), formerly Act of June 4, 1945 (P.L. 1388, No. 442) § 31, 71 P.S. § 1710.31.

health, safety and morals of employees.[11] The reorganization plan which merely shifted the administrative responsibility from the Department of Labor and Industry to the DER in no way suggests a diminution of the authority to be vested in the new administering body. Reorganization Plan No. 2 of 1975, 71 P.S. § 756–2 (Supp.1981–82).

Thus, the argument of appellees that the legislature has not provided an enforcement scheme is factually inadequate. The mere fact that this aspect of the enforcement scheme was not included in the Act is of no moment since the Act must be read in *pari materia* with the applicable portions of the Administrative Code. 1 Pa.C.S.A. § 1932; *Geriot v. Council of Borough of Darby,* 491 Pa. 63, 417 A.2d 1144 (1980); *Tomasetti v. Commonwealth, Game Commission,* 490 Pa. 318, 416 A.2d 489 (1980); *Girard School District v. Pittenger,* 481 Pa. 91, 100, 392 A.2d 261, 265 (1978); *Philadelphia Fire Officers Association v. Pa. Labor Relations Board,* 470 Pa. 550, 369 A.2d 259 (1977).

■ Finally, we reject appellees' argument that the order was not issued to correct a violation of the Act or the regulations. Although appellees had argued before the EHB and the Commonwealth Court that their activity was farming, and not subject to Section 2(f), they wisely abandoned that position before this Court. Now appellees assert that the Act, including Section 2(f), is not self-executing and must be implemented before an order preventing inadequate protection of persons and employees may be issued. *Millard v. Municipal Sewer Authority,* 442 F.2d 539 (3rd Cir.1971) and *Matulonis v. Reading Railroad Co.,* 421 Pa. 230, 219 A.2d

11. In *Industrial Board v. Hilti Rapid Fastening Systems, Inc.,* 28 Pa. D. & C.2d 11 (Dauph.1961) where a rejection of approval for sale of a tool by the Department of Labor and Industry, under the Act here discussed and upheld by the Industrial Board in an order to discontinue use until design changes were made and approved, the administrative enforcement powers of the Department of Labor and Industry were unquestioned. *Hilti* is significant here in that it is precedent for the existence of an administrative scheme for enforcement of the duties of the agency implementing the Act.

301 (1966) [12] are cited as authority for the self-executing aspect of the argument. Appellees' reliance upon *Millard* and *Matulonis* is misplaced.

Here, the question is not the effect of the terms of the statute absent implementation, but rather the authority of the agency charged with the implementation. The fact that the provision is not self-executing is the very reason the agency was included in the legislative scheme to provide that implementation.

Appellees' assumption that implementation can only be accomplished through regulation obviously ignores the well-recognized role of the adjudicative process as an alternative implementing tool.

Subsumed in this argument is the contention that there has been no finding of a violation of section 2(f). It is conceded that there was no such explicit finding. Nevertheless, we believe that the EHB's explicit findings [13] inexorably command the conclusion there was such a violation, as the

12. In *Millard v. Municipal Sewer Authority,* 442 F.2d 539 (3rd Cir. 1970), a diversity death action based on negligence, the 3rd Circuit refused to consider the question of whether the language of this section was self-executing and concluded, "Even if this statute were considered self-executing, there would be difficulty relating the cited provisions to appellant's evidence." 442 F.2d at 541.

In *Matulonis v. Reading Railroad Co.,* 421 Pa. 230, 219 A.2d 301 (1966) this Court approved the lower court's holding that the general safety law is not self-executing; thus requiring the injured plaintiff to prove (1) the agency's promulgation of rules and regulations regarding toe-boards on railroad platforms and (2) defendant violated the statute by failing to comply with said rules and regulations.

13. 3. Appellee is the DER, the agency entrusted with the duty to enforce the provisions of the General Safety Act, the Act of May 18, 1937, P.L. 654, 43 P.S. 25.1 *et seq.* as it applies to the operations set forth in Section 25–2(f) of the General Safety Act.

\* \* \* \* \* \*

25. There is no method presently in existence for determining the number of, or the identity of, persons underground in either mine at any given time.

26. A check system which does not account for everyone underground is of little, or no use.

27. The absence of a check system jeopardizes the safety of persons who might be engaged in rescue operations.

Commonwealth Court so found. Under section 2(f) adequate and reasonable protection must be afforded workers in all pits, trenches and mines. It is clear from these findings that adequate and reasonable protection was not afforded all employees or other persons who entered the mines because there was no method for determining the number or identity of the persons in the mine at any given time. The minimal cost in implementing a check system, which is merely a list of names of those entering and exiting the mine, is far outweighed by the lives to be saved in an emergency by such a system.

Moreover, the issuance of an order is not limited to the correction of a violation but also may be employed as a means to establish a standard of conduct in furtherance of the purposes of the Act. Whereas the delegated legislative aspect of the agency's power is generally used to establish standards of conduct, the agency also may utilize, in particular instances, the adjudicative aspect of the agency's power to further standards of conduct needed to meet specialized problems. *See, Securities and Exchange Com. v. Chenery Corp., et al.,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1946). Because of the uniqueness of this situation, this is precisely the type of matter where case-by-case development of standards through the adjudicative process is most appropriate.

Accordingly, the Judgment of the Commonwealth Court is reversed and the Order of the Environmental Hearing Board is reinstated.

O'BRIEN, C.J., concurs in the result.

FLAHERTY, J., dissents.