DEPARTMENT OF
ENVIRONMENTAL PROTECTION,
Petitioner

v.

CUMBERLAND COAL RESOURCES,
LP and Amfire Mining Co., LLC,
Respondents.

Department of Environmental
Protection, Petitioner

v.

Emerald Coal Resources, L.P. and
Cumberland Coal Resources,
L.P., Respondents.

Commonwealth Court of Pennsylvania.

Argued April 6, 2011.
Decided Sept. 20, 2011.

---

Dennis Whitaker, Harrisburg, for petitioner.

Ralph Henry Moore, II, Pittsburgh, for respondents.

BEFORE: LEADBETTER, President Judge, and McGINLEY, Judge, and PELLEGRINI, Judge, and SIMPSON, Judge, and LEAVITT, Judge, and BROBSON, Judge, and McCULLOUGH, Judge.

OPINION BY Judge BROBSON.

In these consolidated appeals, Petitioner Department of Environmental Protection (DEP) petitions for review of two orders of the Environmental Hearing Board (EHB), both of which involve the Bituminous Coal Mine Safety Act (Act).[1] In an order dated March 30, 2010, EHB granted summary judgment in favor of Respondents Emerald Coal Resources (Emerald) and Cumberland Coal Resources (Cumberland) (collectively, Emerald/Cumberland), concluding that DEP lacked the power to issue certain compliance orders for failure of Emerald/Cumberland to report "accidents" in accordance with Section 109(a)(1) of the Act.[2] In an order dated March 16, 2010, EHB granted summary judgment in favor of Amfire Mining Company (Amfire) and Cumberland (collectively, Amfire/Cumberland),[3] concluding that the Act did not empower DEP to regulate and/or cite Amfire/Cumberland for their failure to provide portable fire extinguishers on pieces of equipment referred to as scoops. For the reasons set forth below, we affirm EHB's decisions in both cases.[4]

---

1. Act of July 7, 2008, P.L. 654, 52 P.S. §§ 690–101 to –708.

2. 52 P.S. § 690–109(a)(1).

3. Where appropriate, we will refer to Emerald, Amfire, and Cumberland collectively as "Operators." The Act defines "operator" to include "[a]n owner, lessee or other person who operates, controls or supervises a coal mine." Section 104 of the Act, 52 P.S. § 690–104. It is undisputed that Emerald,

Amfire, and Cumberland are operators under the Act.

4. In addition to the two orders set forth above, DEP also appeals a February 24, 2010 order of EHB, denying its motion for summary judgment in the Emerald/Cumberland "accidents" case. For the same reasons we affirm EHB's order granting summary judgment in favor of Emerald/Cumberland, we also affirm EHB's decision to deny DEP's request for summary judgment.

## I. BACKGROUND[5]

### Pertinent Provisions of the Act

The Act, in general, represents a comprehensive statutory scheme designed to provide for the development of regulations by the Board of Coal Mine Safety (Safety Board), established by the Act, and for DEP's enforcement of the Act and regulations. With respect to rulemaking, under the "findings and purpose" section of the Act,[6] the General Assembly affirmatively determined that "[u]nderground bituminous coal mining is highly specialized ... and requires frequent review, refinement and improvement of standards to protect the health and safety of miners."[7] Further, "[t]he formation of appropriate rules and practices to improve health and safety and to provide increased protection of miners can be accomplished more effectively by individuals who have experience and expertise in underground bituminous coal mining and underground bituminous coal mine health and safety."[8] The General Assembly also stated that one of the purposes of the Act is to "[e]stablish a rulemaking process that enables the expeditious updating of the interim health and safety standards established under this act and to otherwise protect the health, safety and welfare of miners and others in and about mines."[9]

Effecting the foregoing legislative intent, the Act provides the Safety Board with the following rulemaking authority: "The board shall have the authority to promulgate regulations that are necessary or appropriate to implement the requirements of this act and to protect the health, safety and welfare of miners and other individuals in and about mines." Section 106.1(a) of the Act.[10] Further, the Act directs the Safety Board to address revisions to the interim mandatory safety standards the General Assembly adopted in Chapters two and three of the Act and to address "[h]azards not addressed by existing safety standards." Section 106.1(f)(1), (2) of the Act.[11] Subsection 106.1(f) expressly provides that these specific tasks should not be interpreted to limit the broader powers afforded to the Safety Board under Section 106.1 of the Act.

DEP's general powers and duties under the Act are set forth in twenty-one (21) separately-numbered paragraphs in Section 105 of the Act.[12] DEP also has the authority to "issue written orders to enforce this act, to effectuate the purposes of this act and to protect the health and safety of miners and individuals in and about mines." Section 501(a)(1) of the Act.[13] Though extensive, DEP's powers and duties under the Act do not include rulemaking authority.[14]

---

5. The parties do not dispute the underlying facts in these cases, and we derive the facts from EHB's decisions.

6. Section 103 of the Act, 52 P.S. § 690–103.

7. Section 103(a)(7) of the Act.

8. Section 103(a)(8) of the Act.

9. Section 103(b)(3) of the Act.

10. 52 P.S. § 690–106.1(a).

11. 52 P.S. § 690–106.1(f)(1), (2).

12. 52 P.S. § 690–105.

13. 52 P.S. § 690–501(a)(1).

14. In fact, DEP lacks rulemaking authority generally with respect to Commonwealth environmental laws that it is charged with implementing and enforcing. As this Court has observed, "DEP lacks authority to promulgate regulations that relate to the programs it administers and enforces. Such regulations are promulgated by the Environmental Quality Board [EQB] after public comment and hearings." *Borough of Bedford v. Commonwealth, Dep't of Envtl. Prot.*, 972 A.2d 53, 62 (Pa. Cmwlth.2009); *see* Section 1920—A of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S. § 510–20

Section 109 of the Act relates to "accidents" and thus has particular relevance to the Emerald/Cumberland matter. Section 109(a)(1) requires mine operators, *inter alia,* to notify DEP no later than fifteen (15) minutes following the discovery of an "accident." Section 104 of the Act defines the term "accident" as follows:

"**Accident.**" An unanticipated event, including any of the following:

(1) A death of an individual at a mine.

(2) An injury to an individual at a mine, which has a reasonable potential to cause death.

(3) An entrapment of an individual at a mine, which has a reasonable potential to cause death.

(4) An unplanned inundation of a mine by a liquid or gas.

(5) An unplanned ignition or explosion of gas or dust.

(6) An unplanned mine fire not extinguished within ten minutes of discovery.

(7) An unplanned ignition or explosion of a blasting agent or an explosive.

(8) An unplanned roof fall at or above the anchorage zone in active workings where roof bolts are in use.

(9) An unplanned roof or rib fall in active workings that impairs ventilation or impedes passage.

(10) A coal or rock outburst that causes withdrawal of miners or which disrupts regular mining activity for more than one hour.

(11) An unstable condition at an impoundment or refuse pile. . . .

(12) Failure of an impoundment or refuse pile.

(13) Damage to hoisting equipment in a shaft or slope which endangers an individual or which interferes with use of the equipment for more than 30 minutes.

(14) An event at a mine which causes death or bodily injury to an individual not at the mine at the time the event occurs.

Section 109 of the Act also imposes specific duties on DEP in the event of an accident. DEP shall "[t]ake whatever action it deems appropriate, including the issuance of orders, to protect the life, health or safety of an individual" and shall "[p]romptly decide whether to conduct an investigation of the accident and inform the operator and the representative of the miners of its decision." Section 109(b)(1) and (2) of the Act.

The provision of the Act at issue in the Amfire/Cumberland matter is Section 273(f) of the Act,[15] which pertains to fire protection and provides: "Transportation.—Each track or off-track *locomotive,* self-propelled mantrip car or personnel carrier shall be equipped with one portable fire extinguisher." (Emphasis added.)

### *Failure to Report "Accidents"*

#### a. *Emerald*

Emerald attempted to cut-through—or connect—one portion of a mine (designated, B–6) with another (designated, B–7). In so doing, Emerald failed to follow its pre-determined plan for the cut-through, which included stationing a mine examiner in one end of the mine (B–6) to await the

(granting rulemaking authority to Environmental Quality Board). What is different about the Act is that rather than placing rulemaking authority in the EQB, the General Assembly created the Safety Board as a special-purpose entity to promulgate regulations in the area of mine safety.

**15.** 52 P.S. § 690–273(f).

approaching crew mining in the other section of the mine (B–7), from which the cut-through would connect to B–6. The plan required the mine examiner to close two doors that the company had installed for the purpose of maintaining the planned ventilation currents in the mine following the cut-through. Although the mine examiner went to the B–6 area, he did not stay there and the doors remained open when the cut-through occurred.

As a consequence of this failure to follow the planned procedure, a witness to the cut-through felt the air along the conveyor belt reverse and could feel heat from the "feeder on his face." Further, a methane detector on the shuttle car sounded an alarm. Once roof control measures were in place in the connection area, employees passed into the B–6 area and closed the doors, and the ventilation current returned to its proper path.

DEP issued a compliance order to Emerald dated January 30, 2009. In the compliance order, DEP indicated that Emerald had violated the Act by failing to notify DEP in a timely manner that an "unanticipated event" (or accident under Section 104 of the Act) occurred in the B–7 section of Emerald's mine during the afternoon of January 19, 2009. The compliance order directed Emerald to take corrective action by February 6, 2009, consisting of instructing mine officials of the requirements of Section 109(a)(1) of the Act. Additionally, DEP's compliance order directed that, in order for Emerald to effectuate a "termination" of the compliance order, Emerald was required to conduct an investigation of the event and to write (and submit to DEP) a written report in accordance with Section 109(a)(4) of the Act. Emerald appealed to EHB.

### b. Cumberland

During the evening of February 12, 2009, a Cumberland mine experienced a loss of electrical power because of a storm. The power outage caused the fan in the ventilation system to stop working. Cumberland maintains a back-up system. Cumberland expects that the back-up system will start automatically under such circumstances, but the back-up system did not work as expected that day. The ventilation system did not work for more than 16 minutes. When a ventilation system is down for 15 minutes, mine operators are required to evacuate the entire mine.

DEP issued a compliance order to Cumberland. The form part of that order did not mention Section 109(a)(1) of the Act in particular. Rather, it stated that "[t]he posted guidelines for inspector notification was not followed. The district mine inspector was not notified of a fan outage that occurred on 2/12/2009.... [T]his outage lasted in excess of 15 minutes and resulted in the evacuation of the mine." (Reproduced Record (R.R.) at 18a.) Cumberland appealed the compliance order to EHB.

### Failure to Provide Portable Fire Extinguishers on "Scoops"

DEP issued several compliance orders and notices of violation to Amfire and Cumberland, citing the companies for violating Section 273(f) of the Act by failing to provide portable fire extinguishers on their scoops. In its decision in the Amfire/Cumberland matter, EHB described a scoop as follows:

A scoop is a battery-powered, four-wheeled vehicle equipped with a bucket. Scoops are used in underground bituminous coal mines to transport tools, materials, and coal. Scoops are typically in use daily and may travel throughout the mine. The scoops in question have an electric engine that is powered by a large, powerful battery. There is only

one seat, which is used by the operator. Scoops are not used to transport miners. They are not used to pull cars of supplies or coal.

(Amfire/Cumberland Decision at 2.) Amfire/Cumberland challenged DEP's interpretation of Section 273(f) as applying to scoops by appealing the compliance orders and notices of violation to EHB.

### EHB's Decisions

*a.  Emerald/Cumberland—"Accidents"*

EHB reviewed the definition of the term "accident" in Section 104 of the Act. EHB opined that the particular events did not fall within one of the fourteen specific events identified in the definition of accident.[16] EHB reasoned that the General Assembly, by using the word "including" to introduce the fourteen events the General Assembly identified, intended to provide room to add to the list. Although EHB agreed with DEP that the events at issue were of a type or character similar to the events identified in Section 104's definition of the term "accident," EHB opined that DEP had no power to enlarge the list of events identified in Section 104 of the Act through the issuance of compliance orders.

EHB reasoned that DEP's efforts to expand the list constituted an attempt to make policy through the adjudicatory process. DEP thus exceeded its authority under the Act because the Act's comprehensive scheme vests in the Safety Board, not in DEP, the power to "add[ ] flesh to the statutory bones" of the Act through rulemaking. (Emerald/Cumberland Opinion at 8.) EHB opined that there may be circumstances where DEP appropriately

may issue compliance orders for failure to notify DEP of an event, but that DEP in this case was improperly attempting to create a universal rule through enforcement actions against particular operators. EHB noted that adjudicative rulemaking is best left for situations in which an administrative agency is interpreting and implementing existing requirements, not "promulgating" new requirements.

EHB also observed that, before the General Assembly adopted the Act, DEP applied guidelines that it had developed relating to notification requirements. Those former guidelines included sixteen types of events that would trigger the duty of an operator to notify DEP of an "accident." The General Assembly, however, elected to include only fourteen of those events in its definition of the term "accident." The remaining two types of events that the General Assembly elected not to include in its list, EHB observed, are similar to the two events at issue in this case. Thus, EHB reflected, the General Assembly apparently made a deliberate decision to exclude those two events from the list.

In addition, EHB reasoned that the provision at issue here—notification to DEP within fifteen (15) minutes of the occurrence of the events—requires such quick action that operators should be able to know in advance of an event whether they are required to provide notice to DEP under the Act. Finally, EHB commented that if DEP's ultimate concern was health and safety, the Act provides DEP with other corrective powers, including a specific provision relating to ventilation that requires an operator to notify DEP when a foreman determines a mine is becoming

---

16.  As an initial matter, EHB noted that, although DEP's notice to Cumberland did not cite the definition of "accident" and the reporting provision of the Act, the parties had briefed the issue as if DEP had cited both provisions. EHB, therefore, concluded that "the issue of whether DEP can rely on a statutory violation not cited in the order is ... not before us." (Emerald/Cumberland Opinion at 5, attached to Petitioner's Brief.)

unsafe at any time because of lack of ample ventilation.

### b. Amfire/Cumberland—"Scoops" as "Locomotives"

DEP took the position that scoops are "off-track locomotives," and, therefore, under Section 273(f) of the Act, Amfire/Cumberland were required to equip their scoops with portable fire extinguishers. Citing Webster's Dictionary, which defines a locomotive as "something that is used to move non-powered cars," EHB concluded that scoops are not locomotives. EHB and the parties also consulted an industry dictionary—The United States Bureau of Mines, Dictionary of Mining, Mineral and Related Terms—which defines locomotive as follows:

> An electric engine, operated either from current supplied from trolley and track or from storage batteries carried on the locomotive. The locomotive may be powered by battery, diesel, compressed air, trolley, or some combination such as battery-trolley or trolley-cable reel. Used to move empty and loaded mine cars in and out of the mine.

EHB reasoned that this definition, like the common dictionary definition, includes a common characteristic that scoops do not have—i.e., the conveyance in question must be used to move unpowered cars. Further, EHB reasoned that the coal mining industry dictionary definition of the term "scoop" suggests that scoops do not fall within the Act's definition of a locomotive.

EHB agreed with Amfire/Cumberland that there are other types of self-propelled vehicles used in mining operations, and that if the General Assembly wanted to require fire extinguishers for all of them, it could have adopted a broader provision. EHB concluded that the word "locomotive" is not ambiguous, and, therefore, EHB did not need to defer to DEP's suggested interpretation. EHB concluded that DEP's interpretation of Section 273(f) of the Act was not reasonable and that DEP did not have the power to require operators to provide portable fire extinguishers for scoops either under its general statutory authority or under its power to issue orders to enhance safety and further the purposes of the Act. EHB viewed DEP's actions as an attempt to amend the Act on an ad hoc basis. Additionally, EHB echoed the concerns that it had with the Emerald/Cumberland matter—that "operators should have a clear understanding of what the law requires and be able to plan for compliance in advance." (Amfire/Cumberland Opinion at 5.)

## II. ISSUES ON APPEAL[17]

DEP raises four (4) separate issues in its brief. One overriding question, however, predominates in this appeal, and that question goes to the heart of DEP's first two issues. From the Act, we can discern the clear intent of the General Assembly to vest rulemaking authority in the Safety Board and administrative and enforcement authority in DEP. The overarching question is to what extent, if at all, the Safety Board's authority and DEP's authority overlap.

---

17. This court's standard of review of a decision by EHB is limited to determining whether EHB committed an error of law, violated constitutional rights, or whether substantial evidence supports its findings of fact. *Bethenergy Mines, Inc. v. Dep't of Envtl. Prot.*, 676 A.2d 711 (Pa.Cmwlth.), *appeal denied*, 546 Pa. 668, 685 A.2d 547 (1996). "On appeal from the entry of summary judgment, the appellate court may reverse EHB where there has been an error of law or a clear or manifest abuse of discretion." *Global Eco-Logical Services, Inc. v. Dep't of Envtl. Prot.*, 789 A.2d 789 (Pa.Cmwlth.2001).

DEP takes the position on appeal that EHB erred when it concluded that DEP lacked the authority, through its enforcement powers, to require mine operators to report certain unanticipated events not expressly listed in the definition of "accident" in the Act. While the Safety Board can augment or expand the list through rule-making, DEP argues that it can do the same thing through its enforcement powers, and, consequently, EHB erred in concluding otherwise. Similarly, with respect to the Amfire/Cumberland matter, DEP argues that its general enforcement authority empowers DEP to compel a mine operator to do something that the Act does not specifically require even in the absence of a Safety Board regulation imposing such a requirement. In short, DEP takes the position that its ability to expand upon the Act's express requirements is coextensive with the Safety Board's authority. The General Assembly merely authorized both entities to do the same thing through different vehicles—DEP by enforcement and adjudication and the Safety Board by rule-making.

Alternatively, in its other two stated issues on appeal, DEP claims that it did not expand upon the requirements in the Act in either the Emerald/Cumberland matter or the Amfire/Cumberland matter. Instead, DEP merely interpreted the definition of "accident" and the fire extinguisher requirement. DEP claims that because it is the agency with enforcement and administrative powers under the Act, EHB erred in not deferring to DEP on the meaning of these provisions in the Act.

## III. DISCUSSION

In considering the parties' briefs in these consolidated appeals, it is easy to lose sight of the fact that these matters all started with particular enforcement actions by DEP against the Operators. It is the validity of these particular enforcement efforts that was at issue before EHB and, as a consequence, is now at issue before us on appeal. Rather than focusing on the particular enforcement efforts in the Emerald/Cumberland and Amfire/Cumberland matters, however, DEP phrases the issues in much broader terms. In a way, DEP would like this Court to rule generally that DEP's enforcement powers under the Act are so expansive that they authorize DEP to impose new requirements on mine operators that are not expressly set forth in the Act or regulations promulgated by the Safety Board.

We conclude, however, that it is neither necessary nor appropriate for us, in the context of these consolidated appeals involving particular enforcement actions, to define for all purposes the metes and bounds of DEP's enforcement powers under the Act in relation to the Safety Board's rulemaking authority. While we must examine DEP's authority under the Act, we will only do so as necessary to decide the question of whether DEP exceeded its authority in pursuing the particular enforcement actions against the Operators that are the subject of these consolidated appeals.

### Emerald/Cumberland

As indicated above, DEP issued its compliance orders to Emerald/Cumberland for their alleged failure to provide notice to DEP no later that fifteen (15) minutes following discovery of an accident. Whether the circumstances support a conclusion that Emerald/Cumberland violated Section 109(a)(1) of the Act in this regard is a question of statutory construction, meaning we must attempt to determine the intent of the General Assembly.[18]

18.  When interpreting a statute, this Court is guided by the Statutory Construction Act of

It is undisputed that the events in question do not fall within the list of events included in the statutory definition of "accident" in Section 104 of the Act. This, however, does not end the inquiry if the list can be expanded by rulemaking or adjudication—i.e., if the list is not exhaustive.

### a. Whether the List of "Accidents" Can Be Expanded Without the General Assembly's Action?

DEP issued its compliance orders against Emerald/Cumberland based upon its conclusion that the list in Section 104 of the Act provides only examples of types of "accidents," and that DEP had the authority to expand the list through its administration and enforcement powers. On appeal, Emerald/Cumberland argue that the list is exhaustive and can only be expanded by the General Assembly. DEP argues that the Court should defer to its interpretation.

■ When a statute is ambiguous, courts generally respect the expertise of the agency upon which the General Assembly has vested enforcement or interpretive responsibilities and defer to that agency's interpretation of ambiguous statutory language. *Velocity Express v. Pennsylvania Human Relations Comm'n*, 853 A.2d 1182, 1185 (Pa.Cmwlth.2004) (*Velocity* ). If, however, an agency's interpretation of a statute is erroneous or "frustrates legislative intent," a court need not defer to the agency's proffered interpretation. *Id.* (quoting *Rosen v. Bureau of Professional and Occupational Affairs*, 763 A.2d 962, 968 (Pa.Cmwlth.2000), *appeal denied*, 566 Pa. 654, 781 A.2d 150 (2001)).

■ "A statute is ambiguous or unclear if its language is subject to two or more reasonable interpretations." *Bethenergy Mines, Inc. v. Dep't of Envtl. Prot.*, 676 A.2d 711, 715 (Pa.Cmwlth.), *appeal denied*, 546 Pa. 668, 685 A.2d 547 (1996). The statutory definition of the term "accident" provides that an accident is "[a]n unanticipated event, including any of the following . . . .," which precedes a list of events. DEP asserts that the key language in the definition is "[a]n unanticipated event." DEP contends that this language reflects a legislative judgment that the list is not exhaustive. Also, the General Assembly used the word "including," which maybe interpreted "as a word of enlargement or of illustrative application." Black's Law Dictionary 763 (6th ed.1990); *see Velocity*, 853 A.2d at 1186 (holding that General Assembly's use of word "includes" before specific list meant list plus others of "same general kind or class"). The definition, however, also uses the word "any" to modify the list of identified events the General Assembly included in the definition of the term "accident." The General Assembly's use of the word "any" suggests that the

1972, 1 Pa.C.S. §§ 1501–1991, which provides that "the object of all interpretation and construction of all statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). "The clearest indication of legislative intent is generally the plain language of a statute." *Walker v. Eleby*, 577 Pa. 104, 123, 842 A.2d 389, 400 (2004). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). Only "[w]hen the words of the statute are not explicit" may this Court resort to statutory con-

struction. 1 Pa.C.S. § 1921(c). Moreover, "[e]very statute shall be construed, if possible, to give effect to all its provisions." 1 Pa.C.S. § 1921(a). It is presumed "[t]hat the General Assembly intends the entire statute to be effective and certain." 1 Pa.C.S. § 1922(2). Thus, no provision of a statute shall be "reduced to mere surplusage." *Walker*, 577 Pa. at 123, 842 A.2d at 400. Finally, it is presumed "[t]hat the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable." 1 Pa.C.S. § 1922(1).

General Assembly might have intended that the list is exclusive. Both interpretations are reasonable, and, consequently, we conclude that the provision is ambiguous.

For the same reasons, we also conclude that DEP's interpretation of the definition of "accident" in a way that allows for additional events of the same general kind or class as those expressly set forth is not clearly erroneous—*i.e.*, it is reasonable and flows from the language chosen by the General Assembly.[19] Moreover, interpreting the Act in this way would allow for greater reporting of events at mines that might pose a health or safety risk to "those who work in and at mines and others in and about mines." Section 103(a)(1) of the Act. Accordingly, DEP's interpretation does not frustrate the General Assembly's legislative intent; rather, it furthers it. Consequently, we must defer to DEP's interpretation of the definition of the term "accident" as providing a non-exhaustive list of events.

### b. How May the List of Events Constituting an "Accident" Be Expanded?

■ DEP asserts that, especially in the absence of rulemaking action on the part of the Safety Board, it may expand the list through its administrative and enforcement powers. Thus, according to DEP, EHB erred in concluding that only the Safety Board could expand the list through rulemaking.

■ The courts have generally accepted the notion that administrative agencies have the power to implement binding policy either through rulemaking (and its formal process to adopt substantive rules) or through the adjudicatory process—*i.e.* enforcement (and its creation of binding precedent). *Pa. Human Relations Comm'n v. Norristown Area Sch. Dist.*, 473 Pa. 334, 345, 374 A.2d 671, 677 (1977) (*Norristown*).[20] Further, when an agency has the power to act through either rulemaking or adjudication, courts have recognized that the particular agency is in the best position to decide whether the agency should act by adjudication or rulemaking. *Id.* Our Supreme Court in *Norristown* quoted at length from an opinion by the United States Court of Appeals for the District of Columbia, finding its reasoning persuasive:

"An administrative agency has available two methods for formulating policy that

---

**19.** Emerald/Cumberland argue that by reference to the Federal Mine Safety Act definition of "accident" and the General Assembly's decision to pair down a DEP pre-Act list of sixteen (16) "unanticipated events" to the fourteen (14) events set forth in the federal law's definition of "accident," the General Assembly intended to make the list exhaustive. We note, however, that although the General Assembly's list is identical to the list of events in the federal definition, 30 C.F.R. § 50.2(h), the General Assembly chose different words preceding its list. Where the federal regulation provides that the term "accident" *means* any of the same fourteen events identified by the federal Mine Safety and Health Administration, the General Assembly elected to use the word *including*. Given this distinction, we do not agree with Emerald/Cumberland that the General Assembly clearly intended the list in Section 104 of the Act to be exhaustive.

**20.** *Norristown* involved the Pennsylvania Human Relations Commission's (PHRC) effort to resolve school desegregation issues in the Norristown Area School District. When the school district failed to submit to the PHRC an adequate desegregation plan, the PHRC initiated an enforcement action against the school district by filing a complaint under the Pennsylvania Human Relations Act (PHRA), Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951–963. In that enforcement action, the PHRC relied on written guidelines that it had published six (6) years earlier. Norristown alleged that the proceeding was "illegal" because the PHRC did not formally adopt the published guidelines as regulations.

will have the force of law. An agency may establish binding policy through rulemaking procedures by which it promulgates substantive rules, or through adjudications which constitute binding precedents. A general statement of policy is the outcome of neither a rulemaking nor an adjudication; it is neither a rule nor a precedent but is merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications. *A general statement of policy, like a press release, presages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications.*

The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent administrative proceedings.... *A properly adopted substantive rule establishes a standard of conduct which has the force of law....* The underlying policy embodied in the rule is not generally subject to challenge before the agency."

*Id.* at 349–50, 374 A.2d at 679 (*quoting Pacific Gas & Electric v. FPC,* 506 F.2d 33, 38 (D.C.Cir.1974)) (alterations in original) (emphasis added).

DEP relies heavily on *Norristown* to support its claim that it could use the adjudicatory process, initiated through its enforcement powers, to expand the list of events that constitute an "accident" under the Act. But the comparison to *Norristown* is imperfect. In *Norristown,* the PHRC initiated an enforcement action against the school district when the school district failed to submit an adequate desegregation plan years after the PHRC had published school desegregation guidelines. Here, by contrast, DEP did not issue *any* advance notice to operators that it would consider the events at issue in the Emerald/Cumberland matter as "accidents" under Section 104 of the Act.

We perceive this lack of advance notification to mine operators significant in light of the manner by which the General Assembly chose to define "accident" in the Act. When Congress created the federal law relating to bituminous coal mining, it left it to the Safety Board's federal counterpart—the Mine Safety and Health Administration—to define what "accident" means under the federal law.[21] Our General Assembly, however, initially identified in the Act particular mine-related incidents that the General Assembly believed warranted prompt notice—fifteen (15) minutes—to DEP. It then authorized the Safety Board, not DEP, to develop the Act further through rulemaking. Implicit in the General Assembly's decision to provide a robust definition of "accident" in the Act is a recognition that operators must have sufficient advanced notice of what is expected of them if they are to comply with the fifteen (15) minute notice requirement in Section 109(a)(1) of the Act in the event of an "accident."

If we were to adopt DEP's position that it has the power to expand the Act's requirements through the adjudicatory process, operators would be left to conduct business in a constant state of uncertainty as to when they must provide DEP the notice required under Section 109(a)(1) of the Act. The fourteen (14) events set forth by the General Assembly in the definition of "accident" in Section 104 of the Act would become only a partial list of events and thus unreliable in terms of ensuring full compliance. To avoid the risk of an enforcement action by DEP, then, operators would be compelled, out of an abun-

21. *See* 30 C.F.R. § 50.2(h).

dance of caution, to notify DEP *anytime* something unanticipated occurs at a mining facility. We believe that the General Assembly did not intend for such an absurd result.

In our view, efforts to punish any regulated entity for failing to act when the entity had no reason to know action was required makes little sense. It certainly does not further the legitimate interest of ensuring compliance with the law. One cannot comply if it does not know when or how it must comply. By proceeding as it did, DEP essentially sought to expand the list of events that constitute "accidents" under the Act. While doing so no doubt would provide other mine operators advance notice of what DEP expects of them in the future, we find no support in the Act for a process that imposes new notice requirements on all operators at the expense of particular operators—Emerald/Cumberland—who had no such advance notice. As EHB stated:

> Section 109 requires action within fifteen minutes [of discovery of an "accident"]. There should be no room for doubt in a case where such action is required. Unlike [DEP], we believe that operators should be able to tell in advance whether notice [to DEP of an "accident"] is required.

(Emerald/Cumberland Opinion at 14.) [22]

In discussing the limitations on the power of an agency to set binding policy through adjudication, Emerald/Cumberland refer the Court to our decision in *Department of Environmental Resources v. Rushton Mining Company*, 139 Pa. Cmwlth. 648, 591 A.2d 1168 (*Rushton Mining*), *appeal denied,* 529 Pa. 626, 600 A.2d 541 (1991). In *Rushton Mining,* coal mine operators challenged "standard conditions" the Department of Environmental Resources (DER) [23] sought to impose in its mining permits as "regulations" that DER had failed to promulgate in accordance with the statute commonly known as the Commonwealth Documents Law.[24] The Court summarized the purposes behind the requirement that an agency properly promulgate regulations:

> The process by which regulations are issued provides an important safeguard for potentially affected parties against the unwise or improper exercise of discretionary administrative power. This process, which includes public notice of a proposed rule, making a request for written comments by any interested party, giving due consideration to such comments, and holding hearings as appropriate, affords the affected parties a democratic process for participation in the formulation of standards which govern their conduct and increases the likelihood of administrative responsiveness to their needs and concerns. Moreover, it gives the administrative agency facts and information relevant to the proposed rule, as well as opens up the agency to alternatives, detrimental effects, criticism and advice, thereby contributing to the soundness of the proposed regulation. Not only is sound regulation promoted by this process, but

---

22. As EHB noted, operators face potentially significant consequences for violations of the notification requirement, including criminal liability and civil penalties. (Emerald/Cumberland Opinion at 13.) Although DEP contends that it did not seek to impose penalties in these cases, we view the potential for severe sanctions as a significant reason why operators need to know in advance of an "accident" whether an event may possibly subject them to such consequences.

23. DER was the predecessor agency to the current DEP.

24. Act of July 31, 1968, P.L. 769, *as amended,* 45 P.S. §§ 1102–1602.

it increases the likelihood of administrative responsiveness to the needs and concerns of those affected, because it promotes acquiescence in the result, even when the objections of those affected remain the same as to substance. *Rushton Mining,* 591 A.2d at 1171 (citations omitted).

More pertinent to this case, however, is the Court's discussion in *Rushton Mining* of DER's argument that, alternatively, DER had the power to impose the standard conditions through the use of its adjudicatory power in interpreting the applicable environmental statute and seeking to "effectuate the intent of the mining statutes." *Id.* at 1174. The Court in *Rushton Mining* described the relevant distinctions between the rulemaking and adjudicatory functions as follows:

> The DER argues in the alternative that even if the standard conditions were regulations which it failed to promulgate, the DER had adjudicatory power to implement standard conditions to effectuate the intent of the mining statutes. The DER relies on the holding in *Lopata v. Unemployment Compensation Board of Review,* 507 Pa. 570, 493 A.2d 657 (1985), for the proposition that a two-step method is required when it is claimed that an agency adjudication is based upon a regulation which was not promulgated. The DER contends that under *Lopata,* we are first required to determine whether the challenged agency adjudication was based upon a statement of policy which should have been adopted as a regulation. Then, we must determine whether the agency's decision should be upheld as a valid exercise of its adjudicative function. That question turns on an issue of statutory construction.
>
> While the DER may be correct in stating that it can announce the conditions it intends to implement in future rulemakings via "statements of policy," the standard conditions found on its permit form were not conditions that were applied as appropriate in granting the permits, because they were ministerially attached to each of the permits and were not statements of policy because they required compliance before the application was approved.
>
> However, in *Lopata* ... the regulation[ ] in question dealt with the way in which the Unemployment Compensation Board interpreted a statute. If the agency interpretation of a statute is incorrect, it is an appropriate function of the adjudicatory process to provide the correct interpretation. *In this case though, the DER is not interpreting a statute, but rather, is setting forth supplemental provisions to an existing statute. The attachment of standard conditions to permits is not an interpretive function, but instead, a regulatory one, and the adjudicative process would be inappropriate for announcing agency policy.* Therefore, the DER's argument is without merit.

*Id.* at 1174–75 (footnotes omitted) (emphasis added). The above-quoted passage describes the difference between an agency's action "interpreting a statute" and an agency's action "setting forth supplemental provisions to an existing statute." In this case, DEP contends that its issuance of citations constitutes interpretation of the Act, whereas Emerald/Cumberland argue that DEP did not engage in simple statutory construction, but rather created supplemental provisions to an existing statute.

We agree with Emerald/Cumberland that DEP's compliance orders do not reflect the exercise of an interpretive function, but rather a legislative function. DEP did not simply construe the events expressly listed in the Act's definition of

"accident" as *encompassing* the events in the Emerald/Cumberland matter. Instead, DEP first construed the Act to mean that the list of identified events constituting an "accident" was not exhaustive, but then went beyond merely interpreting the Act by creating distinct additional "unanticipated events" that would thereafter constitute an "accident" under Section 104 of the Act.[25] We interpret the General Assembly's decision to bifurcate the enforcement and rulemaking functions in the Act as an expression of legislative intent that any regulatory act that would impose additional requirements on operators must be effected through the rulemaking process and not the adjudicatory process.

The General Assembly vested the rulemaking function in the Safety Board. Accordingly, only the Safety Board can expand upon the identified activities that constitute "accidents."[26] The Act contains

---

**25.** In its reply brief, DEP relies upon our Supreme Court's decision in *Department of Environmental Resources v. Butler County Mushroom Farm*, 499 Pa. 509, 454 A.2d 1 (1982) (*Butler County*), for the proposition that, under what is commonly referred to as the General Safety Law, Act of May 18, 1937, P.L. 654, 43 P.S. §§ 25–1 to –15, *repealed by* the Act of November 30, 1971, P.L. 554 insofar as the Law is inconsistent with the Surface Mining Conservation and Reclamation Act, Act of May 31, 1945, P.L. 1198, *as amended*, 52 P.S. §§ 1396.1–.31, DER had the power to issue a compliance order directing the operators of a mushroom farming company that used an abandoned mine for farming purposes to expand the check system it used to identify individuals who are in the mine at any given time. The General Safety Law vested in the Pennsylvania Department of Labor and Industry certain duties and authority, including regulatory powers, regarding the conditions of places of employment for workers. The Law also vested in DER enforcement powers and the power to issue "instructions." The Supreme Court opined that this power contemplated not simply the right to make suggestions for work rules, but also included the affirmative authority to *direct* an employer to perform a task aimed toward ensuring the safety of employees.

We agree with Emerald/Cumberland's contention that *Butler County* is distinguishable from this case. Unlike *Butler County*, where the law in question provided *no* statutory direction or discrete delegation of rulemaking and enforcement powers, the Act at issue here reflects a very specific delegation of rulemaking power to the Safety Board. As Operators point out, *Butler County* involved statutory delegations of power enabling DER to issue compliance orders in the face of legislation that was open-ended and lacking in legis-

lative guidance. In the Act, however, the General Assembly did not leave such a void. It expressly delegated enforcement powers and rulemaking powers to separate agencies. In addition, with respect to the Emerald/Cumberland matter, the General Assembly engaged in a thorough examination of the particular events that it believed were "accidents" and that should trigger expedited notice to DEP of the event and included a list of such events in Section 104 of the Act. It thus provided express legislative guidance to operators on how to comply with the notice requirement of Section 109(a)(1) of the Act, something that was missing in *Butler County*.

**26.** We also note that our Supreme Court in *Pennsylvania State Board of Pharmacy v. Cohen*, 448 Pa. 189, 292 A.2d 277 (1972), considered whether the Pharmacy Board could impose sanctions for conduct that was not specifically included in the definition of "grossly unprofessional conduct" under the Pharmacy Act. Act of September 27, 1961, P.L. 1700, *as amended*, 63 P.S. §§ 390–1—390–13. In so doing, the Supreme Court observed that the Pharmacy Act provided the Pharmacy Board with broad rulemaking powers. The Supreme Court noted that certain provisions of the Pharmacy Act authorized the Pharmacy Board to suspend or revoke licenses only "upon proof of violation of any properly adopted rules or regulations promulgated by the Board. It is only by means of these statutorily granted rulemaking powers that the Legislature has empowered the Board to provide additional grounds for sanctions." *Cohen*, 448 Pa. at 197–98, 292 A.2d at 281–82. Similarly in this case, the General Assembly authorized the Safety Board, not DEP, to expand the list of incidents that give rise to a duty on the part of operators to notify DEP of an "accident."

no similar delegation to DEP that would enable DEP to adopt through its enforcement powers binding rules that accomplish the equivalent functions the General Assembly specifically delegated to the Safety Board. We believe that the General Assembly's message is sufficiently clear. While DEP retains its enforcement powers, it may exercise those powers only to enforce the express provisions of the Act and any regulations that the Safety Board promulgates under its rulemaking authority. Thus, we conclude that DEP erred in issuing the compliance orders to Emerald/Cumberland for violating Section 109(a)(1) of the Act.

### c. Whether DEP Had the Power to Issue the Compliance Orders under Sections 105 and 501 of the Act?

■ DEP argues that even if Emerald/Cumberland did not violate Section 109(a)(1) of the Act, DEP was nonetheless empowered to issue the compliance orders to ensure the health and safety of miners and those working in and around bituminous coal mines. DEP points first to the following authority in Section 105 of the Act:

The department shall have the power and duty to administer a mine safety program for individuals employed at mines. The department has the power and duty to do all of the following:

. . . .

(2) Conduct investigations and interviews of individuals at a mine or elsewhere.

(3) Issue orders to implement and enforce provisions of this act.

. . . .

(21) Perform any act not inconsistent with any provision of this act, which it may deem necessary or proper for the effective administration or enforcement of this act and rules and regulations promulgated under this act.

DEP also relies on Section 501(a)(1) of the Act, which provides:

The department may issue written orders to enforce this act, to effectuate the purposes of this act and to protect the health and safety of miners and individuals in and about mines.

DEP argues that nothing in the Act suggests an intent on the part of the General Assembly to curtail DEP's pre-Act power to issue administrative orders. We agree that DEP continues to have broad enforcement powers under the Act with respect to mining operations. But while the Act did not eliminate DEP's power to issue administrative orders in general, we cannot ignore the clearly expressed intent of the General Assembly in the Act to vest all rulemaking authority in the new Safety Board, and, consequently, not in DEP. Although DEP retains its power to issue compliance orders, the statutory authority from which this power emanates does not vest DEP with the power to issue the orders at issue in these cases. The Act clearly creates some tension between the powers of the Safety Board and DEP's powers. We can, however, interpret the Act to give meaning to DEP's broad powers to enforce and protect, while remaining faithful to the apparent intent of the General Assembly to leave the larger policy decisions to the General Assembly, through the express terms of the Act, and the Safety Board through the promulgation of regulations.

In this instance, DEP seeks to use its general enforcement powers to regulate an activity that the General Assembly has already regulated elsewhere in the Act—the expedited reporting of "accidents" to DEP. We are simply not persuaded by DEP's argument that the General Assembly would go to such an effort to provide

expressly for an expedited reporting requirement for accidents in Section 109(a)(1), while also allowing DEP to use its general enforcement powers under the Act to impose a similar reporting requirement for events that the General Assembly did not include in its definition of "accident." Neither Section 105 nor Section 501 of the Act extend DEP the authority to create rules and requirements that conflict with those enacted by the General Assembly or, for that matter, the Safety Board.[27]

Accordingly, DEP lacked the authority under both Sections 105 and 501 of the Act to issue the compliance orders in the Emerald/Cumberland matter for events that the General Assembly and the Safety Board have not included in the class of events identified as reportable accidents under the Act. A key purpose of the Act was to create a body—the Safety Board—to develop rules and regulations governing the operation of bituminous coal mines. Another key purpose of the Act was to separate the rulemaking function from the enforcement function. DEP's interpretation of its powers under Sections 105 and 501 in this case represents an expansion of DEP's enforcement powers beyond what the General Assembly intended.[28]

### Amfire/Cumberland

As indicated above, DEP issued several compliance orders and notices of violation to Amfire/Cumberland, citing the companies for violating Section 273(f) of the Act by failing to provide portable fire extinguishers for their scoops. Applying principles of statutory construction, we must determine whether EHB erred in concluding that DEP failed to establish a violation of Section 273(f) of the Act. If we find that EHB did not so err, we must determine whether DEP may nonetheless, through its general enforcement powers, require operators to include portable fire extinguishers for scoops.

### a. Whether DEP Established a Violation of Section 273(f)?

■ Section 273(f) of the Act provides that "[e]ach track or off-track locomotive, self-propelled mantrip or personnel carrier shall be equipped with one portable fire extinguisher." The Act does not define

---

**27.** This conclusion does not render the General Assembly's delegations to DEP meaningless. Rather, DEP may continue to interpret the Act and enforce the existing provisions of the Act. We are not concluding that DEP lacks the power to engage in interpretation of the accident-reporting requirement of the Act when a party engages in conduct that may fall within one of the defined events. For example, one of the identified events under the definition of "accident" occurs when a mine is inundated with liquid or gas. If the events at issue in the Emerald/Cumberland matter had also resulted in a displacement of breathable air by an inundation of gas, DEP could have evaluated the circumstances and concluded that the mines became inundated with a gas and that Emerald/Cumberland had violated the notification provision by failing to contact DEP within fifteen (15) minutes. We simply hold that DEP may not, through its enforcement powers, expand the types of events that may be considered "accidents" in light of (a) the list already created by the General Assembly and (b) the General Assembly's delegation of rulemaking authority to the Safety Board, not DEP.

**28.** Emerald/Cumberland also argue that if DEP is correct with regard to its view of Sections 105 and 501 as delegating to DEP the power to issue the adjudications, then (1) these provisions are invalid under the rule of statutory construction to construe penal statutes strictly; (2) the General Assembly violated the separation of powers clause by improperly delegating to an administrative body the power to legislate through the adoption of additional events constituting accidents; and (3) the provisions are void under the vagueness doctrine. Based upon our resolution above, we need not address these additional arguments.

the term "locomotive." DEP interpreted this provision by concluding that the term "locomotive" encompasses scoops. For the reasons expressed below, we agree with EHB's analysis and likewise conclude that DEP's interpretation of the term "locomotive" to include scoops was erroneous.

Because the General Assembly did not define the term "locomotive," EHB consulted Section 1903(a) of the Statutory Construction Act, 1 Pa.C.S. § 1903(a), which instructs that in order to determine legislative intent, technical words "that have acquired a peculiar and appropriate meaning" should be construed in accordance with such "appropriate meaning and definition." EHB noted that the technical definition of the term "locomotive" was not dramatically different from the common dictionary definition, but that the common characteristic of both the technical and common definition is essentially a "powered vehicle used *to move nonpowered vehicles.*" (EHB Opinion at 3 (emphasis added).) EHB, referring to the definition of "scoops" in the technical reference U.S. Bureau of Mines, Dictionary of Mining, Mineral and Related Terms,[29] surmised that scoops do not have that characteristic.

We agree with EHB's analysis and conclusion that DEP erred in interpreting the term "locomotive" to encompass scoops, which are clearly by definition not "powered vehicles used to move nonpowered vehicles." We do not believe that the term "locomotive" in the statute is ambiguous or that EHB was required to defer to DEP's interpretation of the term "locomotive," which we, like EHB, believe was clearly erroneous in light of prevailing definitions—both ordinary and technical—of the term.

b. *Whether DEP Had the Power to Issue the Compliance Orders and Notices of Violation under Sections 105 and 501 of the Act?*

DEP argues again that its general enforcement powers under Sections 105 and 501 authorized it to issue the compliance orders and notices of violations in the Amfire/Cumberland matter when DEP decided that requiring portable fire extinguishers on scoops would enhance the safety of persons using scoops in mines. For the reasons expressed above with respect to the Emerald/Cumberland matter, we also conclude that Sections 105 and 501 of the Act do not authorize DEP to require portable fire extinguishers on scoops, where the General Assembly has expressly required portable fire extinguishers on certain mine equipment, but *not* scoops.

### IV. CONCLUSION

For the reasons set forth above, we affirm EHB's orders in the Emerald/Cumberland matter and the Amfire/Cumberland matter.

### ORDER

AND NOW, this 20th day of September, 2011, the orders of the Environmental Hearing Board are AFFIRMED.

DISSENTING OPINION BY Judge PELLEGRINI.

When an agency is charged with enforcing the provisions of the Bituminous Coal

---

29. EHB quoted that definition as follows:
   a. Diesel- or battery-powered equipment with a scoop attachment for cleaning up loose material, for loading mine cars or trucks, and hauling supplies.
   b. A large sized shovel with a scoop-shaped blade.
   c. Coal miner's shovel; also sometimes used to refer to scraper.
   d. See: scraper bucket.
   e. A device that gathers ore at feed end of ball mill and delivers it into the feed trunnion.

Mine Safety Act (Coal Mine Safety Act),[1] it has available two methods for formulating policy that will have the force of law. One is through rulemaking procedures by which it promulgates substantive rules. The underlying policy embodied in the rule is not generally subject to challenge before the agency. The other method is not as direct; it is done on a case-by-case basis which will establish whether an agency's interpretation of the statute it is enforcing is correct and which will establish the bounds of that enforcement. The majority holds that the Coal Mine Safety Act takes away the power of the DEP to bring enforcement actions for the failure of any mine operator to report accidents, and the list specifying which accidents must be reported may only be expanded through the issuance of regulations. Unlike the majority, I would hold that the Coal Mine Safety Act did not take away from the DEP the power to issue compliance orders to any mine operator who fails to timely report an "accident" that can cause serious bodily harm or death to a miner. Accordingly, I respectfully dissent from that portion of the majority opinion that holds otherwise.

## I.

Accidents are required to be reported to the DEP. Section 104 of the Coal Mine Safety Act, 52 P.S. § 690–104, defines "accident" as:

An unanticipated event, including any of the following:

(1) A death of an individual at a mine.

(2) An injury to an individual at a mine, which has a reasonable potential to cause death.

(3) An entrapment of an individual at a mine, which has a reasonable potential to cause death.

(4) An unplanned inundation of a mine by a liquid or gas.

(5) An unplanned ignition or explosion of gas or dust.

(6) An unplanned mine fire not extinguished within ten minutes of discovery.

(7) An unplanned ignition or explosion of a blasting agent or an explosive.

(8) An unplanned roof fall at or above the anchorage zone in active workings where roof bolts are in use.

(9) An unplanned roof or rib fall in active workings that impairs ventilation or impedes passage.

(10) A coal or rock outburst that causes withdrawal of miners or which disrupts regular mining activity for more than one hour.

(11) An unstable condition at an impoundment or refuse pile . . .

(12) Failure of an impoundment or refuse pile.

(13) Damage to hoisting equipment in a shaft or slope which endangers an individual or which interferes with use of the equipment for more than 30 minutes.

(14) An event at a mine which causes death or bodily injury to an individual not at the mine at the time the event occurs.

Once an "accident" occurs, Section 109(a)(1) of the Coal Mine Safety Act, 52 P.S. § 690–109, requires mine operators, *inter alia,* to notify the DEP no later than 15 minutes following the discovery of an "accident." That provision requires that the DEP "[t]ake whatever action it deems appropriate, including the issuance of orders, to protect the life, health or safety of an individual" and it shall "[p]romptly decide whether to conduct an investigation of the accident and inform the operator and the representative of the miners of its

---

**1.** Act of July 7, 2008, P.L. 654, 52 P.S.  §§ 690–101–708.

decision." Section 109(b)(1) and (2) of the Coal Mine Safety Act, 52 P.S. § 690–109(b)(1) and (2).

## II.

These consolidated appeals involve two "unanticipated events," one at an Emerald Coal Resources (Emerald) mine and the other at Cumberland Coal Resources (Cumberland) (collectively, Mine Owners). There is no dispute that both incidents posed a threat to the health and safety of miners.

The Emerald incident involved Emerald's plan to cut through one section of a mine to another section. To maintain ventilation, Emerald planned to close two doors following the cut-through but those doors remained open causing the ventilation to be insufficient and a methane detector to sound an alarm. After about 40 minutes, the doors were closed and proper ventilation was restored. This type of incident is not one of the 14 "accidents" specifically listed under the definition of accident. Emerald did not report this incident to the DEP.

When it became aware that Emerald failed to notify it of the violation, the DEP issued a compliance order stating that Emerald had violated the Coal Mine Safety Act by failing to notify the DEP in a timely manner that an "unanticipated event" (or accident under Section 104 of the Act) occurred at its mine. It directed Emerald to take corrective action by instructing mine officials of the requirements of Section 109(a)(1) of the Coal Mine Safety Act, 52 P.S. § 690–109(a)(1), involving notification and requiring them to conduct an investigation of the event and to submit to the DEP a written report in accordance with Section 109(a)(4) of the Coal Mine Safety Act, 52 P.S. § 690–109(a)(4). Emerald appealed to the EHB.

The Cumberland mine incident occurred when the mine lost electrical power causing the ventilation system to stop working. When that occurs, a back-up system generator is to automatically start but it did not do so, causing the ventilation system to be down for almost 17 minutes. When a ventilation system is down for 15 minutes, mine operators are required to evacuate the entire mine. This type of incident is not one of the 14 "accidents" specifically listed under the definition of accident.

When it became aware of the incident, the DEP issued a compliance order to Cumberland stating that "[t]he posted guidelines for inspector notification was not followed. The district mine inspector was not notified of a fan outage that occurred on 2/12/2009 ... [T]his outage lasted in excess of 15 minutes and resulted in the evacuation of the mine." (Reproduced Record at 18a.)

The central issue raised in these appeals is whether the 14 types of accidents denominated in Section 104 of the Act, 52 P.S. § 690–104, are inclusive and make up the exclusive list of accidents that cannot be expanded by adding other types of unanticipated events. If that list is not exhaustive, the issue becomes whether new types of accidents have to be denominated by the Board of Coal Mine Safety before the DEP may issue compliance orders. To resolve these issues, it is necessary to examine what powers and duties the General Assembly gave the DEP and the Board of Coal Mine Safety (Coal Safety Board).

## III.

In enacting the Coal Mine Safety Act, "[t]he General Assembly [found] that it is in the public interest to establish a comprehensive scheme to protect the lives, health and safety of those who work at mines in this Commonwealth." Section 103 of the Coal Mine Safety Act, 52 P.S.

§ 690–103. This comprehensive scheme should take into consideration that "[t]he first priority and concern of all in the bituminous coal mining industry must be the health and safety of those who work in and at mines and others in and about mines." *Id.*

Under Section 105 of the Coal Mine Safety Act, the DEP has "the power and duty to administer a mine safety program for individuals employed at mines and is given the power and duty, among other things, to:

- Conduct investigations and interviews of individuals at a mine or elsewhere.
- Issue orders to implement and enforce the provisions of this act.
- Institute proceedings and actions to implement the provisions and effectuate the purposes of this act, including suits seeking equitable relief or declaratory judgments and suits to recover costs incurred by the department.
- Institute prosecutions against the operator or his agent for a violation of any provision of this act.
- Respond to, coordinate and assist responses to mine accidents and other emergencies.
- Perform any act not inconsistent with any provision of this act, which it may deem necessary or proper for the effective administration or enforcement of this act and the rules or regulations promulgated under this act.

52 P.S. § 690–105.

Under the Coal Mine Safety Act, rule-making was entrusted to the Coal Safety Board, not the DEP. The Coal Safety Board is composed of three members who represent the coal industry and three members who represent the viewpoint of working miners. The Coal Safety Board was given "the authority to promulgate regulations that are necessary or appropri-ate to implement the requirements of this act and to protect the health, safety and welfare of miners and other individuals in and about mines." Section 106.1(a) of the Act, 52 P.S. § 690–106.1(a).

### IV.

The majority finds, and I agree, that the 14 types of accidents are not exclusive. It arrived at that conclusion because "accident" is defined as "[a]n unanticipated event, including any of the following . . . ," which indicates that the list was not all encompassing. The majority noted that the federal regulations implementing the Federal Mine Safety Act, stating that although the General Assembly's list is identical to the list of events in the federal definition, 30 C.F.R. § 50.2(h), the federal regulation provides that the term "accident" *means* any of the same 14 events identified by the federal Mine Safety and Health Administration, but the General Assembly elected to use the word *including*. Because the list is non-exhaustive, the majority concluded that the term "accident" allows for the reporting of additional events of the same general kind or class.

As to what type of additional "accidents" must be reported, the majority holds that unless the Coal Safety Board issues regulations adding new accidents, mine owners do not have to report them to the DEP under the Coal Mine Safety Act, and the DEP is precluded from using the adjudicative process to determine whether an event is an accident within the ambit of the Coal Mine Safety Act. It arrived at the conclusion because when Congress created the federal law relating to bituminous coal mining, it left it to the Coal Safety Board's federal counterpart—the Mine Safety and Health Administration—to define what "accident" means under the federal law, and that had to mean that the General Assembly also gave to the Coal Safety

Board the power to define what was an accident. Because the General Assembly gave that power to the Coal Safety Board, the majority goes on to hold that the DEP cannot, through enforcement actions, require mine operators to report additional accidents similar to the types listed. Moreover, it posits that because the Coal Mine Safety Act requires that accidents be reported within 15 minutes under Section 109(a)(1) of the Act, that unless additional reportable accidents were implemented through regulation, mine operators, to avoid the risk of an enforcement action by the DEP, would be compelled to notify the DEP anytime something unanticipated occurred at a mining facility.

## V.

I disagree with the majority because there is nothing in the Coal Mine Safety Act that indicates that an administrative agency's normal power to enforce is dependent on the issuance of regulations. In *Department of Environmental Resources v. Butler County Mushroom Farm*, 499 Pa. 509, 454 A.2d 1 (1982), our Supreme Court addressed and rejected an argument that regulations must be issued to implement an aspect of the regulatory program of that act. In that case, the Department issued a compliance order to a mine operator to keep track of all visitors to its mine by keeping a log of comings and goings. Nothing in the statute addressed at all the safety of visitors, only mine employees. The argument was made that the DEP lacked the power to issue a compliance order absent regulations. In rejecting that argument, our Supreme Court stated that "the issuance of an order is not limited to the correction of a violation but also may be employed as a means to establish a standard of conduct in furtherance of the purposes of the Act. Whereas the delegated legislative aspect of the agency's power is generally used to establish standards of

conduct, the agency also may utilize, in particular instances, the adjudicative aspect of the agency's power to further standards of conduct needed to meet specialized problems." *Id.*, 499 Pa. at 521, 454 A.2d at 8. It then went on to state:

The importance to an administrative agency of the power to issue compliance orders was best described in *Security [Securities] and Exchange Commission v. Chenery Corp., et al.*, 332 U.S. 194, 202–203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1946[1947]).

Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity.

In other words, problems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is, thus, a very definite place for the case-by-case evolution of statutory standards, and the choice made between

proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency.

*Id.,* 499 Pa. at 513 n. 2, 454 A.2d at 4 n. 2. It noted, though, while depriving the agency of the adjudicatory power which is a customary and vital tool in the functional operations of present day administrative agencies, and such a result is contrary to the normal practice of our General Assembly, this uniqueness must, nonetheless, be accepted if it, in fact, represents the true legislative intention.

This is not the true legislative intent here. Nothing in the Coal Mine Safety Act indicates that the General Assembly intended that enforcement of the Coal Mine Safety Act was dependent on the Coal Safety Board's enactment of regulations. To the contrary, the Coal Mine Safety Act gave to the DEP the power to enforce reporting of those events in accord with it powers to "[i]ssue orders to implement and enforce the provisions of this act." Once the list of events contained in Section 104 is found not to be exclusive, then the DEP may issuance compliance orders to require a mine operator to report to the DEP similar events as those accidents enumerated. Otherwise, the Coal Safety Board would not just issuance regulations, but become a quasi-enforcement body hindering the enforcement of the Coal Mine Safety Act and the safety of miners.

To buttress its argument that the Coal Mine Safety Act required the Coal Safety Board to issue regulations because mine owners would not have sufficient notice of what required reporting, the majority focuses on that "accident" is defined as an "unanticipated event" and that could mean that mine operators were required to report all such events. However, that term, when interpreted with the 14 types of accidents that follow, shows that the type of accidents that have to be reported are those that have the potential of causing harm or death to an individual under the Coal Mine Safety Act. By making those 14 accidents not exhaustive, the General Assembly wanted such accidents reported that could cause serious harm or death to miners. Reporting of such accidents allows the DEP to "[t]ake whatever action it deems appropriate, including the issuance of orders, to protect the life, health or safety of an individual." Section 109(b)(1) and (2) of the Act. If it causes the mine operators to over-report incidents in an exercise of caution, so be it, because the net effect will be an increase the safety of miners. In any event, if the DEP cites someone for not reporting an incident incorrectly, then the mine operator can appeal that determination to refine whether it was an "accident" within the meaning of the Coal Mine Safety Act.

Accordingly, I respectfully dissent.

President Judge LEADBETTER and Judge McCULLOUGH join in this dissenting opinion.